Marcia L. KING and Charles G. Simpson

v.

Lisa PULASKI, Appellee.

**Appeal of Marcia L. KING.**

Superior Court of Pennsylvania.

Argued Jan. 28, 1998.
Filed March 30, 1998.

Mark J. Shire, Monessen, for appellant.

Kenneth Ficerai, Greensburg, for Pulaski.

Before DEL SOLE, HUDOCK, and JOAN ORIE MELVIN, JJ.

HUDOCK, Judge:

On October 31, 1992, Marcia L. King and Charles G. Simpson were involved in a two-vehicle accident with Lisa Pulaski. The collision occurred when King, who was driving, and Simpson were lawfully stopped at an intersection, waiting to make a left turn into a gasoline station. At that time, Pulaski drove her vehicle into the rear end of King and Simpson's car, thereby forcing King and Simpson's car into oncoming traffic.

After being extricated from her car approximately thirty minutes after the accident, King was treated at Mon Valley Hospital and released later that evening. From November of 1992 until September of 1994, due to muscular pain caused by the accident, King received chiropractic treatment from Dr. Philip Caffari. In September of 1994, King discontinued treatment with Dr. Caffari because she was dissatisfied with her recovery

progress. She then consulted with another chiropractor, Dr. Jack Taylor, and continued her treatment with him until July of 1995.

At the time of the accident, King was employed on a full-time basis as a salad bar attendant at a Hoss's Steak and Sea House restaurant. King's fringe benefits at Hoss's included medical coverage and a profit sharing plan. Additionally, King maintained part-time employment as a dietary aid at South Hills Health System—Jefferson Hospital.

During the month following the accident, King did not work at either Hoss's or Jefferson Hospital. Thereafter, pursuant to Dr. Caffari's recommendation that she could return to "light-duty" employment, King returned to both of her jobs on December 1, 1992. Upon her return to Hoss's, King asked her supervisor, Wayne Crise, whether there were any light-duty positions at which she could work. Crise replied that, while there were several such positions at Hoss's, none were currently available. For the next several weeks, King resumed her salad bar attendant duties.

In late December of 1992, King told Dr. Caffari that the lifting and bending necessary at her Hoss's job aggravated her pain. Dr. Caffari then gave King a note excusing her from work for medical reasons and King took a leave of absence from Hoss's. Approximately one year later, in December of 1993, King formally resigned from Hoss's because she still could not physically perform the duties of her former job.

With respect to her part-time employment at Jefferson Hospital, King was able to resume her normal duties as a dietary aid following the initial, month-long, leave of absence immediately following the accident. In May of 1995, after completing training as a nurse's aid, King obtained full-time employment at Jefferson.

On October 6, 1994, King and Simpson filed a joint civil complaint against Pulaski to recover damages for their injuries arising from the 1992 auto accident. In November of 1996, following standard pre-trial procedures, the case was tried before a jury. Prior to the trial, Pulaski admitted liability.

The contentious trial issues, therefore, centered upon the injuries, if any, which King and Simpson sustained in the accident and the damages to be awarded therefor.

King testified in detail relative to her job duties at Hoss's. In sum, King's testimony established that, as a salad bar attendant, she was required to do a great deal of heavy lifting and carrying, as well as bending and reaching. Further, because the job was in the restaurant service industry, it necessitated that she work at a fast pace.

King's supervisor, Wayne Crise, corroborated King's testimony relative to the scope of her work duties. Further, Crise testified that King had been a good employee for the four years preceding the accident but that, following the accident, King's pace was slower and she sometimes had to ask other employees for assistance.

King's treating physicians, Drs. Caffari and Taylor, testified by way of videotape deposition. Dr. Caffari stated that he had approved King for light-duty employment only and that activities such as heavy lifting would prolong the healing process.

Thereafter, King proposed to introduce the testimony of a vocational expert, Jay K. Jarrell, regarding the calculation of King's lost wages, health insurance benefits, and profit sharing plans. In response, Pulaski filed a motion in limine seeking to exclude Jarrell's testimony. In support thereof, Pulaski stated that King had not laid a proper foundation for the introduction of the proposed expert's testimony. More particularly, Pulaski argued that Pennsylvania law requires the introduction of specific medical evidence of a plaintiff's inability to perform a job before a jury may consider lost wages as an element of damages. Because King's doctors had not specifically stated that King was unable to perform her duties at Hoss's, Pulaski argued, Jarrell should be precluded from testifying.

At a lengthy sidebar discussion, the parties presented their respective arguments to the court. King argued that the law does not mandate that a doctor provide a specific medical opinion that the plaintiff cannot perform his or her job. Instead, King averred, medical evidence must be presented from

which a jury could reasonably conclude that the plaintiff was so incapacitated. Further, King argued, such sufficient evidence was presented in the instant matter and the expert, therefore, should be permitted to testify. In response, Pulaski reiterated her prior argument that, absent a specific medical opinion pertaining to a plaintiff's inability to work, it would be improper to allow a jury to consider lost wages as a part of damages. After much discussion, the court granted Pulaski's motion in limine, stating to King: "I don't think you have the magic words." N.T., 11/15/96, at 175.

After the parties rested their cases, the court charged the jury. Because Pulaski had previously admitted her negligence, the court specifically instructed the jurors that they must find Pulaski negligent and that neither King nor Simpson could be found contributorily or comparatively negligent. Rather, the court instructed, the jury must begin its deliberations by considering whether Pulaski's negligent conduct was a substantial factor in bringing about the plaintiffs' claimed injuries.

The jury was then instructed that, should it answer the causation inquiry in favor of the plaintiffs, it must then determine the proper measure of damages to compensate the individual plaintiffs. With respect to lost wages, the court informed the jury that, while King testified that she missed a substantial amount of work due to her injuries, the jury was not to consider lost wages as an element of its damage award.

After deliberating for three hours, the jury sent a note to the court in which it asked, "Can we find for the plaintiff without giving any monetary award?" *Id.* at 251. The judge, in turn, asked the jury to clarify whether their question related to one or both plaintiffs. The jury responded that their question referred only to King's co-plaintiff, Simpson. After conferring with the parties, the judge answered the jury's question in the negative.

Soon thereafter, the jury returned its verdict. Despite the court's plain instructions to

the contrary, the jury found for the defendant, Pulaski, in the case of *Simpson v. Pulaski.* In the case of *King v. Pulaski*, the jury found for the plaintiff, King, and awarded compensatory damages in the amount of $600.00.

King filed a timely motion for post-trial relief in the nature of a new trial. Therein, King argued, *inter alia*, that the verdict "bears no relationship to the uncontroverted testimony presented at trial" and was, thus, against the weight of the evidence. Motion for Post–Trial Relief, at 3. King also alleged that the court erred in granting Pulaski's motion in limine, which barred King from introducing expert vocational testimony at trial.[1]

By order dated March 10, 1997, the court denied King's post-trial motion. In its accompanying opinion, the court stated that, while "this Court is inclined to award a new trial for failure of the jury to follow the court's instructions and **for inadequacy which does shock this Court's conscience**, this Court believes plaintiff has waived these reasons for a new trial by failing to object to the verdict in a timely fashion." Opinion, 3/10/97, at 6 (emphasis added). By way of explanation, the court opined that King had waived her right to challenge the weight of the jury's verdict by failing to object before the jury was dismissed. In support of this decision, the court relied upon this Court's holding in *Picca v. Kriner*, 435 Pa.Super. 297, 645 A.2d 868 (1994).

Further, the court reaffirmed its decision to exclude the proposed testimony of King's expert vocational witness. Again, the court reiterated that "there must be specific medical evidence that a claimant is unable to perform their job before wage loss can be considered by a jury." Opinion, 3/10/97, at 4–5. This Court's holding in *Gordon v. Trovato*, 234 Pa.Super. 279, 338 A.2d 653 (1975), was cited in support of the decision to grant Pulaski's motion in limine.

■ It is well-settled that, in order for a claim of error to be preserved for appellate

---

1. King's co-plaintiff, Simpson, did not join in the filing of post-trial motions and is not a party to the present appeal.

review, a party must make a timely and specific objection before the trial court at the appropriate stage of the proceedings. *See, e.g., Brown v. Philadelphia Tribune Co.*, 447 Pa.Super. 52, 668 A.2d 159, 162 (1995). The failure to do so will result in waiver of the issue. *Id.*

In *Picca v. Kriner, supra*, this Court held that, under the unique facts of that case, a plaintiff who failed to object to the jury's verdict before it was dismissed was barred from requesting a new trial. Factually, *Picca* was similar to the instant matter in that it involved a rear-end, two-vehicle collision in which liability was not at issue.

Procedurally, however, *Picca* is distinguishable from the present case. After the *Picca* jury was charged as to damages, it retired for deliberation with a set of special interrogatories, one of which was broadly worded and confusing. There was no objection made to the overly broad wording of the interrogatory before it was given to the jury. Likewise, there was no objection made after the jury returned a confusing and ambiguous verdict.

On appeal, this Court held that the appellant waived her challenge to the weight of the evidence because the record was unclear as to whether the jury determined, incredibly, that the victim sustained no injuries as a result of the accident or whether the jury simply determined that the tortfeasor's actions were not a substantial factor in bringing about the victim's actual injuries. Further, we held that the inherent ambiguity in the record was caused by the appellant's failure to object to the wording of the interrogatory at some point before the jury was dismissed.

Specifically, we held as follows:
But events did not so transpire, and on appeal we are left with an ambiguous record. We cannot tell whether the jury incredibly found that Picca suffered no injuries, or whether it found that Kriner's negligence did not cause enough of Picca's alleged injuries to make his negligence a substantial factor in bringing them about— a mistaken, albeit reasonable, interpretation of the second verdict interrogatory. It does not matter, however, because in

either event, Picca waived her right to ask for a new trial by not objecting to the problems with the verdict **before** the jury was dismissed.

*Picca*, 645 A.2d at 871.

In the several years since our decision in *Picca*, we have had occasion to review several similar procedural challenges. As a whole, we have found that the result reached in *Picca* is only appropriate in cases in which the jury returns an ambiguous verdict which can be traced to a litigant's failure to ensure the proper wording of a jury charge or special interrogatories.

For example, in *Henery v. Shadle*, 443 Pa.Super. 331, 661 A.2d 439 (1995), we were faced with the threshold issue of whether, pursuant to *Picca*, the appellant waived his right to object to the jury's verdict. In rejecting the appellee's waiver claim, we stated as follows:

We are of the mind that *Picca* is not applicable to the instant case since, in *Picca*, the jury was given specific interrogatories containing overly broad language about which Picca could have made an objection before they went to the jury. Further, since the *Picca* verdict revealed that the jury there misinterpreted an interrogatory, counsel should have attempted to have any confusion resolved by further deliberation. In the present case, however, there were no specific interrogatories for the jury to answer in rendering its verdict, and the trial court gave a clear, concise jury charge outlining the applicable law of the case.

\*　　\*　　\*　　\*　　\*　　\*

Thus, it seems that **application of the *Picca* waiver rule is more prudently restricted to verdicts of obvious inconsistency and clear, certain irrationality.**

*Henery*, 661 A.2d at 441–42 (footnote omitted) (emphasis added).

Similarly, in the case of *Fillmore v. Hill*, 445 Pa.Super. 324, 665 A.2d 514 (1995), this Court was called upon to determine "whether a trial court may properly deem waived an issue relating to a jury's problematic, but not inconsistent, verdict because a party failed to

object to the verdict prior to the jury's dismissal by the trial court judge." *Id.* 665 A.2d at 514. In *Fillmore,* a case which also involved a two-car collision, the special interrogatories answered by the jury reflected its determination that the plaintiff and the defendant were each 50% negligent and that the plaintiff sustained injuries in the accident. Nonetheless, the jury refused to award any damages to the plaintiff.

As in the instant case, the *Fillmore* plaintiff did not object to the jury's verdict prior to its dismissal. The plaintiff did, however, file a timely post-trial motion in which he claimed that the verdict was against the weight of the evidence. In denying relief, the trial court relied upon, *inter alia,* our decision in *Picca* for the proposition that the plaintiff waived his right to a new trial by failing to object while the jury was still empaneled.

Upon review, this Court held that the trial court's reliance upon *Picca* was misplaced. As we explained, the *Picca* waiver rule is only applicable to cases in which a litigant's failure to object to improper or ambiguous jury instructions or interrogatories causes an inconsistent verdict. The waiver rule should not be applied to cases in which the verdict is clear and unambiguous, albeit problematic, troublesome or disappointing.

■ This rule is consistent with the long-standing policy of our courts not to invade the province of the jury in issues relating to credibility and fact-finding determinations. Thus, a verdict that is inconsistent because the jury received ambiguous or incorrect instructions may be corrected at the trial stage by explaining to the jury why their verdict is flawed and asking the jury to deliberate anew with reference to the correct legal principles.

In so doing, however, a court must ensure that it is not encouraging a substantive change in a verdict that was reached following a proper jury charge and, if applicable, the answering of properly worded special interrogatories.

As the *Fillmore* Court held:

Once a jury returns its verdict, a trial court judge has the ability to point out the problems and explain that the verdict is flawed because the jury must return a verdict which is both free from ambiguity and clearly understandable.

\* \* \* \* \* \*

By the same token, the trial court may not, in its additional instructions, "inject itself into the deliberation and encourage a basic change in the intended verdict of the jury. **The court in sending the jury back to correct their findings should not suggest a substantive change in their findings.**" *Fillmore,* 665 A.2d at 517 (*quoting Robinson v. Brown,* 195 Pa.Super. 384, 171 A.2d 865, 868 (1961)) (emphasis added).

With this standard in mind, we have reviewed the facts of the instant matter and, after careful consideration, must reverse the order of the trial court. As previously stated, after receiving three days of testimony relative to King's injuries and their cause, the trial court charged the jury with the applicable principles of negligence law. In their entirety, the jury instructions were clear and unambiguous. The jury was then given a general verdict slip and proceeded to deliberate. Several hours thereafter, the jury returned a verdict for King in the amount of $600.00.

This verdict, while arguably inadequate, problematic, and disappointing to the plaintiff, nonetheless clearly and unambiguously reflected the jury's fact-finding and credibility determinations. There was no flaw in the verdict in the sense that the jury misunderstood the applicable law, received an ambiguous jury charge, or answered poorly worded interrogatories in a confusing manner.

■ Thus, any further instructions from the trial court, at the request of King's counsel, would have been wholly improper in that the court would have suggested to the jurors that they make a substantive change in their findings. *See Fillmore, supra.* Such actions would have impermissibly encroached upon the jury's function. As we stated in *Fillmore,* "the trial judge did not have the option of sending the jury back to re-deliberate because there was no ambiguity or evidence of a misunderstanding. **A judge is not at liberty to suggest that the weight of the**

evidence did not support a damage award." *Id.* at 519 (emphasis added) (citation omitted).

▆ Although the court in the instant matter denied relief based upon King's failure to object to the verdict at trial, it nonetheless stated that, but for King's omission, a new trial was warranted. Specifically, the court stated that the jury's compensatory damage award of $600.00 was inadequate and "does shock this Court's conscience." Opinion, 3/10/98, at 6. In this respect, we must defer to the trial court who observed all the witnesses and had a perception of the entire trial that we cannot obtain from a review of the cold record. Therefore, in light of the foregoing analysis and our holding that the waiver rule is inapplicable to the present case, we reverse the order of the trial court and remand this case to the trial court for a new trial.

We will now address the second issue presented on appeal. As previously stated, King has also objected to the trial court's decision to grant Pulaski's motion in limine to exclude the testimony of King's expert vocational witness. Since this issue will likely be revisited during retrial, we will briefly address its merits.

In precluding the proffered expert's testimony, the court below relied upon this Court's holding in *Gordon v. Trovato, supra,* for the proposition that expert medical testimony must specifically establish that a plaintiff is unable to perform his or her job before wage loss can be considered. As the court stated: "[I]n the opinion of this Court, unless there is specific medical testimony that plaintiff cannot perform her job and for what period of time, any testimony thereon would be purely speculative and prohibited by *Gordon.*" Opinion, 3/10/97, at 5.

After careful review, we believe that the trial court construed *Gordon's* holding too narrowly and, in so doing, improperly excluded King's proffered expert testimony. Indeed, a cursory reading of *Gordon* establishes that a claimant must introduce sufficient evidence from which a jury may assess damages with *reasonable* certainty. *Gordon* does not, however, require *absolute* certainty or, as the trial court in the instant matter

opined, "magic words." N.T., 11/13/96, at 154. Indeed, our Court in *Gordon* specifically held that "[t]he law requires not merely conjecture, but rather sufficient data from which the damages can be assessed with **reasonable certainty.**" *Gordon,* 338 A.2d at 657 (emphasis added) (citations omitted).

This premise has been echoed in a more recent pronouncement from our Court. In *Janson v. Hughes,* 309 Pa.Super. 399, 455 A.2d 670 (1982), this Court reversed a trial court's order which prevented the plaintiff from introducing expert testimony relative to the plaintiff's impaired earning capacity. At trial, the plaintiff introduced expert medical evidence that he suffered permanent injuries as a result of the underlying automobile accident and that he would, therefore, be precluded from engaging in occupational activities requiring heavy lifting.

In disallowing the plaintiff's proffered expert testimony, the trial court held that there was no evidence that plaintiffs "economic horizon had been limited in any way." *Janson,* 455 A.2d at 671. On appeal, the defendants asserted that "evidence of permanent injury by itself is insufficient, and the evidence must also show that the injury will prevent the plaintiff from engaging in a specific type of work." *Id.* The panel majority in *Janson* held that such specificity is not required and, therefore, reversed the trial court's order and remanded the case for a new trial, limited to damages. As we stated: "While this evidence, like most evidence of impairment of earning power, is imprecise and difficult to evaluate, it is nevertheless sufficient." *Id.*

▆ As applied to the instant matter, our review plainly demonstrates that King proffered sufficient evidence to permit expert testimony as to King's lost wages. Prior to the trial court's ruling on Pulaski's motion in limine, both King and her supervisor testified at length relative to King's workplace duties. As a whole, this testimony established that, as a salad bar attendant, King was required to perform a good deal of heavy lifting, bending and carrying. In conjunction with this evidence, King's initial treating chiropractor, Dr. Caffari, testified that King was permitted to return to "light-duty" employment only.

**1206**

Since Hoss's did not have any light-duty positions available for King, Dr. Caffari gave her a note excusing her from work for medical reasons.

We believe that the above testimony established with reasonable certainty and specificity that King could not perform her job duties at Hoss's. The trial court should, therefore, have permitted King to introduce expert testimony relative to her resultant lost income. As with all other testimony, both lay and expert, the jury could then have evaluated the witnesses' credibility and reached a proper, non-speculative verdict regarding this issue.

Judgment reversed. Case remanded to the Court of Common Pleas of Westmoreland County for a new trial. Jurisdiction is relinquished.