Caesar **GORSKI** and Saranne **Gorski, Appellees**

v.

Lawrence **SMITH, Executor of the Estate of Raymond Jenkins, Deceased and Jenkins, Jenkins, Siergiej & Smith, Appellants.**

Superior Court of Pennsylvania.

Argued Oct. 30, 2001.

Filed Oct. 30, 2002.

Reargument Denied Jan. 7, 2003.

---

Jeffrey B. McCarron, Philadelphia, for appellants.

Francis X. Clark, Wayne, for appellees.

Before: McEWEN, P.J.E., CERCONE, P.J.E., and BECK, J.

CERCONE, P.J.E.

¶ 1 Appellants, Lawrence Smith and Jenkins, Jenkins, Siergiej and Smith, the "Jenkins Firm," appeal from the judgment of $461,000 entered on a jury verdict in favor of Appellees, Caesar and Saranne Gorski, hereinafter the "Gorskis." After review, we affirm in part and vacate in part.

¶ 2 This is a case involving attorneys, real estate developers, land, and malfunctioning sewers, the volatile mixture of which spawned considerable litigation. The Gorskis were real estate developers with fourteen (14) acres of land to sell in Skippack Township, Montgomery County, hereinafter referred to as the "property." A gentleman named Iacobucci wished to buy the property and build townhouses, so he entered into negotiations with the Gorskis. The Gorskis retained the services of Attorney Raymond Jenkins, now deceased, who was a principal in the Jenkins Firm, to negotiate a land sales agreement with Iacobucci.

¶ 3 Attorney Jenkins and Iacobucci's representatives entered into talks, which produced a land sales agreement. In this agreement, the Gorskis, as sellers, warranted that they had obtained subdivision approval and final approval from the relevant governmental authorities so that the buyer, Iacobucci, could obtain building permits to construct seventy-nine (79) residential units on the property without any further approvals. *See* Land Sales Agreement, Plaintiff's Exhibit 4, ¶ 8.13, 1.03, 1.06 and 1.07. The agreement also specifically required the Gorskis, as sellers, to warrant that they had satisfied certain requirements which were set forth in a letter of July 2, 1993 from the Skippack Township Solicitor, Thomas M. Keenan, Esquire, to Attorney Jenkins. In this letter the solicitor requested, *inter alia,* that the Skippack Township Sewer Authority forward a letter to him indicating that they would be servicing the subdivision which Iacobucci planned to build. *Id.;* Plaintiff's Exhibit 3. The parties signed the agreement on November 5, 1993, even though the Skippack Township Sewer Authority had not provided written verification that they would be providing sewer service to the property.

¶ 4 As foul fate would have it, problems developed with a sewer pumping facility adjacent to the property, due to excess storm water infiltration. The Skippack Township Sewer Authority would not grant final approval for the subdivision of the property unless the capacity of the pumping station was upgraded by the developer, or the station was replaced with an additional larger sewer line. N.T. Trial, 10/23/2000, at 186–187, 191. Iacobucci refused to pay for such upgrades and took the position that since the Gorskis, as sellers, warranted that they would deliver a fully approved subdivision, it was their responsibility to pay for the necessary upgrades. N.T. Trial, 10/24/2000, at 82.

¶ 5 On June 9, 1994 the Gorskis, through Attorney Jenkins, notified Iacobucci that their land sales agreement was terminated. N.T. Trial, 10/19/2000, at 117. The Gorskis opened discussions with another buyer but apparently did not finalize a sales agreement with that buyer. *Id.* at 122. The Gorskis subsequently asked Attorney Jenkins to commence legal proceedings to release them from their land sales agreement with Iacobucci. Attorney Jenkins filed a complaint on behalf of the Gorskis seeking termination of the land sales agreement on the basis that Iacobucci refused to go forward with the sale of the property until the sewer issue was resolved and that he also refused to agree to terminate the agreement.

¶ 6 Iacobucci, stung by the twin indignities of overflowing sewers, and what he apparently perceived as equally odious business maneuvering, countersued the Gorskis for breach of contract. Both actions were consolidated for a non-jury trial before a judge in Montgomery County, the Honorable Bernard Moore. Judge Moore ruled in favor of Iacobucci in both actions and awarded him a total judgment of $645,000, which represented the amount Iacobucci had paid as a deposit on the property, out of pocket expenses, lost profits on the transaction and prejudgment interest. Trial Court Opinion, filed 1/3/2001, at 2. The final judgment against the Gorskis, including all accrued post-judgment interest, totaled $713,445. N.T. Trial, 10/17/2000, at 118.

¶ 7 The Gorskis, stung by the magnitude of their sudden misfortune, filed for bankruptcy to prevent Iacobucci from executing on the judgment by forcing a sheriff's sale of the property. During the bankruptcy proceedings, the Jenkins Firm filed a claim for its unpaid legal bills. The Gorskis later presented a reorganization plan to the Bankruptcy Court which did not pro-

vide for payment of the unpaid legal bills. Iacobucci subsequently proposed a competing reorganization plan to the Bankruptcy Court that provided not only for full payment of his judgment, but also the legal bills of the Jenkins Firm. The Jenkins Firm subsequently voted for the Iacobucci plan and not the Gorskis' plan. However, before that plan was approved by the Bankruptcy Court, the matter went to mediation, after which the Gorskis settled the Iacobucci claim for $425,000 and discontinued the bankruptcy action.

¶ 8 The Gorskis then commenced the instant action against Raymond Jenkins, individually, and the Jenkins Firm on the basis of breach of contract and negligence for the firm's representation of them in connection with the land sales agreement, and on the basis of breach of contract and negligence for the firm's representation of them at the subsequent trial involving Iacobucci. The Gorskis also proceeded on a claim of bad faith based on the Jenkins Firm's decision to endorse the Iacobucci plan over their plan in the bankruptcy proceedings. Prior to trial, Attorney Jenkins regrettably passed away and Lawrence Smith, Mr. Jenkins executor, was substituted for him as a defendant. Ultimately the case proceeded to a jury trial, before the Honorable Calvin E. Smith, during which there were two (2) weeks of testimony from a number of witnesses.

¶ 9 In its verdict, the jury found Attorney Jenkins and the Jenkins Firm, (referred to *infra*, collectively, as Appellants) to have been negligent in representing the Gorskis in their negotiation of the land sales agreement with Iacobucci and negligent in representing the Gorskis in their lawsuit against Iacobucci. The jury also found that Appellants breached their contractual obligation to provide effective legal representation to the Gorskis in connection with the negotiation of the land sales agreement with Iacobucci. Further, the jury found that Appellants acted in bad faith by voting for the debt discharge plan proposed by Iacobucci in Bankruptcy Court. The only bright spot for Appellants in the jury verdict was that the jury found them not to have breached their contractual duty of providing effective representation to the Gorskis when it represented them in the lawsuit against Iacobucci. Finally, the jury found the Gorskis contributorily negligent in their actions pertaining to the creation of the land sales agreement with Iacobucci.

¶ 10 The jury awarded the Gorskis $435,000 as damages for their successful breach of contract claim involving the drafting of the land sales agreement and $26,000 for their bad faith claims, but they awarded nothing to the Gorskis on their negligence claims, even though they had found the Appellants negligent in both their actions of drafting the land sales agreement and representing the Gorskis in the lawsuit against Iacobucci.

¶ 11 Both the Gorskis and Appellants filed cross motions for post-trial relief. The Trial Court denied Appellants' motion for judgment notwithstanding the verdict but granted the Gorskis' motion to mold the jury's verdict to award damages on the jury's finding that the Appellants had committed legal malpractice by negligently representing the Gorskis in the negotiation of the land sales agreement and negligently representing the Gorskis at the subsequent trial involving Iacobucci. The Trial Court entered an order providing in relevant part:

[T]he jury's verdict is molded to include an award of damages of $435,000.00 for negligence as set forth in Counts I and/or Count III of [the Gorskis'] Second Amended Complaint and that judgment is hereby entered on the jury's verdict in favor of [the Gorskis]

and against [Appellants] in the sum of $461,000.

Trial Court Order, docketed 12/27/2000.[1] This appeal followed.

¶ 12 Appellants present the following six (6) issues for our consideration:

    1. Whether the Evidence Was Insufficient to Establish a Breach of Contract.

    2. Whether the Court Improperly Charged the Jury Concerning the Elements for Breach of Contract.

    3. Whether the Court Improperly Entered Judgment on the Negligence Claims Notwithstanding the Verdict since the Jury Found Plaintiffs Contributory (sic) Negligent and Did Not Award Damages.

    4. Whether the Evidence Established Plaintiff Sustained Recoverable damages Due to the Alleged Actionable Conduct by Defendants Even Though Plaintiffs Profited from the Alleged Malpractice and Plaintiffs' Evidence Established No Damages Due to the Alleged Bad Faith.

    5. Whether the Evidence Established a Cause of Action for Bad Faith.

    6. Whether the Court Improperly Overruled the Motion to Voir Dire the Jurors and for Mistrial in Connection with the Circumstances Which Led to the Dismissal of a Juror.

Appellant's Brief at 4. We will consider these claims *seriatim.*

¶ 13 With respect to Appellants' first issue, they contend that the evidence was insufficient to support the jury's verdict that they breached a contractual obligation to provide legal services when they represented the Gorskis in connection with the negotiation of the land sales agreement

with Iacobucci. In considering a challenge to the sufficiency of the evidence, an appellate court must view the evidence presented in a light most favorable to the verdict winner, grant that party the benefit of all reasonable inferences, and determine whether the evidence introduced at trial was sufficient to sustain the verdict. *Robinson v. Upole,* 750 A.2d 339, 343 (Pa.Super.2000) (citing *Taylor v. Celotex Corp.,* 393 Pa.Super. 566, 574 A.2d 1084, 1088 (1990)). "A party moving for judgment notwithstanding the verdict (i.e., challenging the sufficiency of the evidence) contends that the evidence and all inferences deducible therefrom, viewed in the light most favorable to the verdict winner, is insufficient to sustain the verdict. We will only reverse the denial of such a motion where the lower court committed an abuse of discretion or an error of law." *Kraus v. Taylor,* 710 A.2d 1142, 1147 n. 3 (Pa.Super.1998), *appeal dismissed as improvidently granted,* 560 Pa. 220, 743 A.2d 451 (2000), (citation omitted), (citing *Greer v. Bryant,* 423 Pa.Super. 608, 621 A.2d 999, 1002 (1993)).

¶ 14 Appellants contend that a cause of action against an attorney for breach of contract can be successfully maintained only in those instances when the attorney fails to follow a specific instruction of the client. Appellants maintain that the Gorskis did not prove that Attorney Jenkins failed to follow a specific instruction when he negotiated the land sales agreement on their behalf with Iacobucci. Appellants contend that, absent a showing of a specific instruction that Attorney Jenkins failed to follow, the only claim the Gorskis could make in regards to the contract negotiations was a negligence claim.

---

1. The $461,000 figure included the jury's award of $26,000 on the Gorskis bad faith claims.

¶ 15 The Gorskis respond that Appellants misconstrue the law in regards to what elements must be shown to establish a cause of action for legal malpractice based on a breach of contract theory. The Gorskis contend that the evidence adduced at trial shows that Appellants were retained for the specific purpose of "providing legal representation and advice in connection with their negotiation and entry into the Agreement of sale with Iacobucci." Appellant's Brief at 28. The Gorskis point out that they introduced expert testimony at trial that Attorney Jenkins misinterpreted the provisions of the land sales agreement with respect to the sewer connections and failed to explain their true import to them. These misinterpretations, they contend, were breaches of Attorney Jenkins' contractual duty to provide legal services in a manner consistent with the profession at large.

¶ 16 Generally speaking, for a plaintiff to successfully maintain a cause of action for breach of contract requires that the plaintiff establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages. *Corestates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.1999). In the narrow realm of legal malpractice claims based on an alleged breach of a contract between an attorney and a client, the appellate courts of this Commonwealth have jurisprudentially established, and refined through time, the specific facts which a plaintiff is required to demonstrate in order to establish that a breach of a contractual duty on the part of the attorney has occurred. To properly understand the genesis of the parties competing viewpoints on this matter requires a brief discussion of the evolution of the relevant caselaw.

¶ 17 The principal Pennsylvania appellate caselaw, from which the Appellants derive support for their claim that a cause of action against an attorney for breach of contract can be successfully maintained only in those instances where the plaintiff demonstrates that the attorney fails to follow a specific instruction of the client, is a line of three (3) panel decisions of our Court: *Duke & Co. v. Anderson*, 275 Pa.Super. 65, 418 A.2d 613 (1980), *Hoyer v. Frazee*, 323 Pa.Super. 421, 470 A.2d 990 (1984) and *Rogers v. Williams*, 420 Pa.Super. 396, 616 A.2d 1031 (1992). In *Duke* our Court was addressing the specific question of whether a plaintiff who sues an attorney for breach of contract is required to prove actual damages. Our Court had occasion to review the historical development of case law in which our Supreme Court had ruled that plaintiffs' cases against attorneys could survive a demurrer or motion for a nonsuit and proceed to the jury, even if no actual damages had been proven by the plaintiff. Our Court reviewed cases involving breach of contract claims and also cases in which the attorney was alleged to have been negligent.

¶ 18 In discussing the underlying factual predicates of the cases which they reviewed our Court said:

> However the cases are read, it must be agreed, we believe, that they are alike in all involving a situation in which the client has a choice: either to sue the attorney in assumpsit, on the theory that the attorney by failing to follow specific instructions committed a breach of contract; or to sue the attorney in trespass, on the theory that the attorney failed to exercise the standard of care that he was obliged to exercise. The question presented, therefore, is whether the client should be required to prove actual loss, whichever form of action the client chooses.

*Id.*, at 616. Our Court went on to answer this question in the affirmative and ruled

that a client suing an attorney for breach of contract must demonstrate, as part of his or her claim, actual damages.

¶ 19 Subsequently, in the case of *Hoyer, supra,* our Court used an excerpt from the above quoted language to hold that "an aggrieved client has a choice: 'either to sue the attorney in assumpsit, on the theory that the attorney by failing to follow specific instructions committed a breach of contract; or to sue the attorney in trespass, on the theory that the attorney failed to exercise the standard of care that he was obliged to exercise.'" *Id.* at 992. Our Court then proceeded to analyze the underlying complaint in the case in which the appellants had sued a law firm that had performed a title search for them.

¶ 20 The complaint against the law firms included a count of breach of contract and a count of negligence. The count which alleged breach of contract was based on an averment that the law firm "failed to discover" that the land which the appellants were purchasing was physically smaller than represented by the deed and that the law firm "had advised [appellants] to accept the deed as written without a survey." *Id.* at n. 2. Our Court, relying on *Duke, supra,* noted that because this count did not allege that the appellees failed to follow specific instructions nor did it aver a breach of a specific provision of the contract, the count did not state a "true contract cause of action." *Id.* at 993. Rather, our Court opined the complaint was really stating a claim for negligence.

¶ 21 The reasoning of *Hoyer* was relied upon by our Court in the later case of *Rogers, supra.* In *Rogers* the appellant countersued her criminal defense attorney and his law firm for breach of contract and legal malpractice. Appellant had retained the defense attorney to represent her in a criminal matter in which she was being prosecuted by the United States for fraud-

ulently obtaining student loans. Appellant alleged that she pled guilty in the criminal matter on the advice of the defense attorney. Appellant contended that the attorney had breached his contract with her since, in exchange for $4,500, the defense attorney had "agreed to take her case to trial, i.e. no plea bargain." *Id.*, 616 A.2d at 1032.

¶ 22 On appeal of the trial court's entry of summary judgment dismissing her counterclaim, our Court set forth what it perceived to be the theory on which a breach of contract claim against an attorney rests. Our Court cited to *Duke* and *Hoyer, supra,* and stated: "In assumpsit, the theory is that a breach of contract occurred when the attorney failed to follow a specific instruction of the client." *Id.* at 1033. Our Court rejected Appellant's claim that the attorney failed to follow her instructions to try her case. Our Court reasoned that when she pled guilty she "modified the 'contract.'"

¶ 23 While these cases arguably support Appellants' position, we note that the restrictive view espoused in *Hoyer* and *Rogers,* that a legal malpractice claim for breach of contract is limited solely to those instances in which the plaintiff can show that the attorney failed to follow a specific instruction of the client, no longer has continuing vitality in light of the Supreme Court's more recent ruling in the case of *Bailey v. Tucker,* 533 Pa. 237, 621 A.2d 108 (1993). *Bailey* like *Rogers* involved a legal malpractice claim regarding an attorney's handling of a criminal matter. In its opinion the Court set out to clarify the elements of a claim against an attorney for professional negligence and breach of contract in handling a criminal matter. As a central portion of its discussion, the Court had occasion to analyze the foundational and elemental structure of a claim against

an attorney based on a breach of the attorney-client agreement. The Court noted [An assumpsit claim based on breach of the attorney-client agreement] is a contract claim and the attorney's liability in this regard will be based on terms of that contract. Thus, if an attorney agrees to provide his or her best efforts and fails to do so an action will accrue. *Of course an attorney who agrees for a fee to represent a client is by implication agreeing to provide that client with professional services consistent with those expected of the profession at large.*

*Bailey,* 621 A.2d at 115 (emphasis supplied).

¶ 24 It is obvious then that the Supreme Court did not endorse or adopt our Court's narrow view, expressed in *Hoyer* and *Rogers,* that breach of contract claims are limited to only those instances in which an attorney fails to follow a specific instruction of a client. *Bailey* established the proposition that every contract for legal services contains, as an implied term of the contract, a promise by the attorney to render legal services in accordance with the profession at large. Thus, when an attorney enters into a contract to provide legal services, there automatically arises a contractual duty on the part of the attorney to render those legal services in a manner that comports with the profession at large. Hence, a breach of contract claim may properly be premised on an attorney's failure to fulfill his or her contractual duty to provide the agreed upon legal services in a manner consistent with the profession at large.

¶ 25 Subsequent to *Bailey,* in the case of *Fiorentino v. Rapoport,* 693 A.2d 208 (Pa.Super.1997), *appeal denied,* 549 Pa. 716, 701 A.2d 577 (1997), our Court specifically relied on the holding of *Bailey* to set forth the requisite elements of a claim for

malpractice based on the alleged negligence and breach of contract committed by attorneys and their law firm in the preparation of documents involving the sale of corporate assets. Our Court then proceeded to analyze the expert testimony adduced at trial and concluded that it showed that the lawyers "failed to exercise the ordinary skill and knowledge expected of a lawyer engaged to prepare a contract for the sale of a business." *Id.* at 214. Our Court concluded that this expert testimony supported the client's claim of malpractice based on negligence, but additionally concluded that this evidence "also supports [clients'] contract claim to the extent that it indicates the [lawyers] did not provide their client with 'professional services consistent with those expected of the profession at large.'" *Id.,* (quoting *Bailey, supra* ).

¶ 26 The lawyers in that case had also raised the argument to our Court, which Appellants raise here, that there was no evidence that the lawyers failed to follow the specific instructions of the client. However, our Court noted that the evidence of the case met that standard as well, since the aggrieved client retained the lawyers to draft the contract of sale "to make sure that [he] got paid" and that did not happen. *Id.* at 214.

¶ 27 In the case *subjudice* the expert testimony adduced at trial, looked at in a light most favorable to the Gorskis as the verdict winners, supported the jury's conclusion that Attorney Jenkins failed to fulfill his contractual duty to represent them, in connection with the sale of their property to Iacobucci, in a manner which comported with the standards of the profession at large. Specifically the expert who testified at trial, Attorney William Hoffmeyer, noted that the agreement of sale required the Gorskis to specifically warrant that they could deliver the prop-

erty to Iacobucci with all necessary approvals from the relevant governmental agencies so that the property could be developed. N.T. Trial, 10/19/2000, at 15–17. However, as the expert also pointed out, the agreement did not protect the Gorskis interests in the event that the requested sewer approvals would not be forthcoming. Indeed, the agreement placed the entire responsibility on the Gorskis to obtain those approvals even if an unforeseen contingency arose preventing the Gorskis from obtaining those approvals. There was no specific language in the contract to allow termination in the event that the sewer approvals could not be obtained by the Gorskis. As the expert noted, Mr. Jenkins had represented Mr. Gorski in a past attempt to develop the same property which was unsuccessful due to a moratorium which had been placed on new development by Montgomery County, due to the fact that the capacity of its sewer treatment plant was being overwhelmed by the pace of new construction. *Id.* at 19.

¶ 28 Nevertheless, despite the fact that the contract contained a clear and obvious iron-clad obligation, which bound the Gorskis very tightly to perform, even though there was a distinct and reasonable possibility that their ability to perform would be affected by factors beyond their control, the expert noted that Attorney Jenkins did not apprise the Gorskis of the true nature of this agreement and the possible ramifications to them if the sewer approvals were not forthcoming. *Id.* at 22. Indeed, Attorney Jenkins apparently erroneously apprised the Gorskis that the agreement could be terminated by them, in the event of an unforeseen contingency, under the due diligence clause contained in the agreement. *Id.* at 23; N.T. 10/19/2000, at 106–107. However, as the expert opined, the specific contractual language of this clause only allowed the buyer to inspect the property for certain conditions prior to sale and allowed *only* the buyer to terminate the agreement in the event that the buyer discovered conditions which were unacceptable. *Id.* at 24–25.[2]

2. The specific relevant clause of the land sales agreement, Paragraph 4.02.1 provides as follows:

> **Test and Surveys**. Subject to the provisions of ¶ 4.02.2 and ¶ 4.02.2. hereof, Seller hereby grants Buyer the right and permission at any time or times and from time to time after the execution of this Agreement to the ninetieth (90th) day following Seller's acceptance of this Agreement, (hereinafter "Due Diligence Period") to enter upon the property, to make tests or conduct such site analysis or surveys as Buyer deems necessary and/or proper to determine the existence of any toxic waste or hazardous substance on the Property, and/or the suitability of the Property for constructing building foundations, units, site improvements, and/or an examination of applicable covenants, easements and zoning restrictions, and/or the availability of utilities, water, and sanitary sewer system to the Property, investigate and negotiate terms of development agreements with the township, utility, sewer and water authorities and other governmental agencies, all of which shall be pursued by Buyer with due diligence, and, in the event the results of such tests, surveys, or analysis (sic) are unacceptable to Buyer, ***then Buyer shall have the right at Buyer's election to terminate this Agreement***, provided, however, such election must be made no later than the ninetieth (90th) day following the date of Seller's acceptance of this Agreement.... Buyer may, ***at Buyer's sole discretion***, elect to terminate this Agreement at any time during the Due Diligence Period for then items set forth above. Buyer's ***election*** to terminate pursuant to this ¶ 4.02.1 shall be made in writing to Seller within the Due Diligence Period, and in the event Buyer ***elects to terminate this Agreement***, this Agreement shall terminate and neither party shall have any further liability under this Agreement.

> &#42;   &#42;   &#42;   &#42;   &#42;   &#42;

Land Sales Agreement, Plaintiff's Exhibit 4, ¶ 4.02.1 (emphasis supplied).

¶ 29 The expert also noted that while the buyer, Iacobucci, could elect to terminate the contract if the requisite governmental approvals were not forthcoming, he was under no obligation to do so. In fact, according to the expert, Iacobucci had a choice of remedies under the contract, and could either terminate the contract or compel the Gorskis to perform their obligations to obtain the requisite governmental approvals for the development of the property. N.T. Trial, 10/19/2000, at 27–30; *See also* Land Sales Agreement, *supra,* ¶ 16 (buyer has option to compel specific performance in the event that the seller fails to fulfill obligations under agreement). The Gorskis had no such option under the contract to cancel in the event the approvals were not forthcoming. N.T. Trial, 10/19/2000, at 27. The expert stressed that the normal course of practice which should have been followed in this circumstance would have been for Attorney Jenkins to apprise the Gorskis of the scope of their obligations under the contract so that they could have been made completely aware of their full responsibilities and range of options. Had they been made fully aware, Attorney Hoffmeyer indicated that the Gorskis could then have elected not to go through with the agreement, or insisted on a clause absolving them of liability in the event that the third party approvals were not granted, or, alternatively, shifted the responsibility to the buyer to resolve those problems, should they have arisen. *Id.* at 37–38.

■ ¶ 30 As our Court said in *Fiorentino, supra:*

> In order to advise a client adequately, a lawyer is obligated to scrutinize any contract which the client is to execute and thereafter must disclose to the client the full import of the instrument and any possible consequences which might arise therefrom. The lawyer must be familiar with well settled principles of law and the rules of practice which are of frequent application in the ordinary business of the profession.

*Id.* at 213. Thus, since the evidence established that Attorney Jenkins never fully made the Gorskis aware of what their obligations were under the contract, nor properly explained to the Gorskis the full import of each clause contained therein, prior to them having signed it, Attorney Jenkins cannot be said to have fulfilled his contractual obligation to the Gorskis to provide legal services in a manner consistent with the profession at large.

■ ¶ 31 Moreover, even if we were to accept, *arguendo,* Appellant's claim that a plaintiff suing an attorney must show that the attorney failed to follow a specific instruction of the client, we would find that the record is sufficient to support that Appellant did make a specific instruction, which Attorney Jenkins failed to follow. At trial Mr. Gorski testified that "I asked Mr. Jenkins to make an agreement that if anything developed during the [due diligence] period with the approvals—if anything developed during the thing, that both—both parties just walk away." N.T., 10/19/2000, at 76–77. However, as the expert analysis regarding the relevant provisions of the agreement showed, the Gorskis did not have the contractual option of unilaterally walking away whenever the relevant approvals were withheld. Thus, since Attorney Jenkins failed to follow his client's instructions and insure that an escape clause was inserted in the final agreement, Appellants' argument fails, even under the prior pre-*Bailey/Fiorentino* standard.

■ ¶ 32 Appellants' second argument is a corollary to their first claim. They contend that the Trial Court incorrectly instructed the jury as to the elements of a breach of contract claim since

"[t]here was no mention in the court's instruction to the jury about the need for a specific instruction by the client which the lawyer did not follow." Appellant's Brief at 30. As our Court has stated in a prior case:

When examining jury instructions, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case. *Williams v. Philadelphia Transp. Co.,* 415 Pa. 370, 374, 203 A.2d 665, 668 (1964). "Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue." *Stewart v. Motts,* 539 Pa. 596, 606, 654 A.2d 535, 540 (1995) (quoting *Glider v. Com. Dept. of Hwys.,* 435 Pa. 140, 151–52, 255 A.2d 542, 547 (1969)). A charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." *Id.* (quoting *Voitasefski v. Pittsburgh Rys. Co.,* 363 Pa. 220, 226, 69 A.2d 370, 373 (1949)). When reviewing a charge to the jury, we will not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety. *McCay v. Philadelphia Elec. Co.,* 447 Pa. 490, 499, 291 A.2d 759, 763 (1972).

*Bannar v. Miller,* 701 A.2d 242, 249 (Pa.Super.1997).

¶ 33 As discussed at length, *supra,* a plaintiff's successful establishment of a breach of contract claim against an attorney, subsequent to *Bailey & Fiorentino, supra,* does not require proof by a preponderance of the evidence that an attorney failed to follow a specific instruction of the client. As discussed above, if a plaintiff demonstrates by a preponderance of the evidence that an attorney has breached his or her contractual duty to provide legal service in a manner consistent with the profession at large, then the plaintiff has successfully established a breach of contract claim against the attorney. The Trial Court in this matter instructed the jury that if they found that the Appellants were asked in their capacity as attorneys to give advice regarding the legal effect of the warranties or guarantees in the agreement of sale, and that advice was "not only erroneous but fell below the standard of care required of attorneys," they could then find the Appellants to have "breached their contractual duties to adequately represent their clients." N.T. Trial, 10/26/2000, at 61. We perceive no abuse of discretion on the part of the Trial Court in so charging the jury, since such a charge comports with the legal standards articulated in *Bailey & Fiorentino, supra.*

¶ 34 Appellants next argue that the Trial Court improperly entered judgment notwithstanding the verdict (judgment n.o.v.) in favor of the Gorskis with respect to their claim that Appellants were negligent in representing them in the negotiation of the land sales agreement with Iacobucci (Count I of the Gorskis' Second Amended Complaint). Specifically, Appellants argue that since the jury found the Gorskis to have been contributorily negligent in their actions regarding their role in the negotiation of the land sales agreement with Iacobucci, this finding of contributory negligence completely barred the Gorskis from any monetary recovery for this claim. Hence, the Appellants reason, the Trial Court erred in entering judgment notwithstanding the verdict and awarding the Gorskis damages on this claim.

¶ 35 Our Court's standard of review in an appeal from the grant of a

judgment notwithstanding the verdict is well settled:

> [I]n order to determine the propriety of a decision granting judgment n.o.v. we must determine whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner the benefit of every reasonable inference that can reasonably be drawn from the evidence and rejecting all unfavorable testimony and inferences. We will not reverse the trial court's decision absent the demonstration of either an abuse of discretion or an error of law.

*Rowinsky v. Sperling,* 452 Pa.Super. 215, 681 A.2d 785, 788 (1996), *appeal denied,* 547 Pa. 738, 690 A.2d 237 (1997) (internal citations and quotations omitted).

¶ 36 As our Court has further noted:

> There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Lanning v. West,* 803 A.2d 753 (Pa.Super.2002)(quoting *Goldberg v. Isdaner,* 780 A.2d 654 (Pa.Super.2001)) (*en banc*).

¶ 37 The threshold question we must address, in order to rule on the merits of Appellant's argument, is whether an attorney in a legal malpractice action that is based on a theory of negligence may properly assert, as an affirmative defense under Pennsylvania law, the contributory or comparative negligence of the client. This is an issue of first impression in this Commonwealth at the appellate level.[3] However, a careful examination of the existing caselaw on this matter from other jurisdictions indicates that, of the thirty-one (31) state appellate courts which have dealt with this issue in some fashion, the overwhelming majority have recognized that a client's recovery for legal malpractice can be either entirely foreclosed, or proportionally diminished, as the result of his or her own negligence.

¶ 38 In eighteen (18) states, principles of comparative negligence are applied to apportion relative percentages of fault between a client and an attorney in legal malpractice actions based on negligence principles.[4] In an additional twelve (12)

---

3. We, note, however the well-written opinion of Judge Mark Bernstein of the Philadelphia Court of Common Pleas in the case of *KBF Associates v. Saul Ewing Remick & Saul,* 35 Pa. D & C. 4th 1 (1998). In that case, which involved a case of legal malpractice against a law firm retained to handle a complex bond transaction, the defendant law firm had alleged that the general partner of the firm which issued the bonds was contributorily negligent for failing to check the work of the retained law firm. Judge Bernstein held that under the facts of that case the partner, who was a lawyer, had no duty to check the work of his retained law firm and, as a result,

contributory negligence could not be raised as a defense to the legal malpractice action.

4. These states are Colorado, *See McLister v. Epstein & Lawrence, P.C.,* 934 P.2d 844, 846 (Colo.App.1996); Connecticut, *See Somma v. Gracey,* 15 Conn.App. 371, 544 A.2d 668, 671 (1988); Florida, *See Kovach v. Pearce,* 427 So.2d 1128 (Fla.App.1983); Georgia, *See First Bancorp Mortgage Corporation v. Giddens,* 251 Ga.App. 676, 555 S.E.2d 53, 58 (2001); Iowa, *See Burke v. Roberson and Crowley,* 417 N.W.2d 209 (Iowa 1987); Kansas, *See Pizel v. Zuspann,* 247 Kan. 54, 795 P.2d 42, 52 (1990); Massachusetts, *See Clark v. Rowe,* 428 Mass. 339, 701 N.E.2d 624 (1998); Maine,

states, appellate courts have ruled that the contributory negligence of the client is an affirmative defense to an action for legal malpractice based on negligence.[5] However, we note that of those twelve (12) states, eight (8), have modified the doctrine of contributory negligence, generally, and implemented a system of comparative negligence, either judicially or statutorily. Thus, in those eight (8) states the contributory negligence of a plaintiff is not an absolute bar to recovery in a legal malpractice case.[6]

See *Pinkham v. Burgess*, 933 F.2d 1066 (1st Cir.1991) (interpreting Maine law to allow the doctrine of comparative negligence in legal malpractice cases); *Accord Wheeler v. White*, 714 A.2d 125, 127 (Me.1998) (jury properly instructed on principles of comparative negligence in legal malpractice claim); Michigan, *See Pontiac School District v. Miller, Canfield, Paddock, and Stone*, 221 Mich.App. 602, 563 N.W.2d 693, 704 (1997); Minnesota, *See Bowen v. Arnold*, 380 N.W.2d 531 (Minn.App. 1986); Missouri, *See London v. Weitzman*, 884 S.W.2d 674, 678 (Mo.App.1994); New Jersey, *See Conklin v. Hannoch Weisman*, 145 N.J. 395, 678 A.2d 1060 (1996); New York, *See Cicorelli v. Capobianco*, 89 A.D.2d 842, 453 N.Y.S.2d 21 (1982); *Estate of Nevelson v. Carro, Spanbock, Kaster & Cuiffo*, 259 A.D.2d 282, 686 N.Y.S.2d 404, 406 (1999); Ohio, *See Harrell v. Crystal*, 81 Ohio App.3d 515, 611 N.E.2d 908, 909 (1992); Oklahoma, *See F.D.I.C. v. Ferguson*, 982 F.2d 404, 406–407 (10th.Cir.1991) (applying Oklahoma law and apportioning fault in legal malpractice case between plaintiff and defendant), Oregon, *See Becker v. Port Dock Four*, 90 Or.App. 384, 752 P.2d 1235 (1988); Texas, *See Roberts v. Burkett*, 802 S.W.2d 42 (Tex.App.1990); and Utah, *See Kilpatrick v. Wiley, Rein and Fielding*, 37 P.3d 1130 (Ut.2001).

5. These states are Alabama, *See Ott v. Smith*, 413 So.2d 1129, 1135 (Ala.1982); Arizona, *See Reed v. Mitchell & Timbanard*, 183 Ariz. 313, 903 P.2d 621, 626 (App.1995) (implicitly recognizing defense of contributory negligence in legal malpractice action); California, *See Theobald v. Byers*, 193 Cal.App.2d 147, 13 Cal.Rptr. 864 (Cal.App.1961); Illinois, *See Nika v. Danz*, 199 Ill.App.3d 296, 145 Ill.Dec. 255, 556 N.E.2d 873, 884 (1990); Indiana, *Hacker v. Holland*, 570 N.E.2d 951, 958–959 (Ind.App.1991); Louisiana, *Corceller v. Brooks*, 347 So.2d 274 (La.App.1977); Maryland, *Bagel Enterprises Inc. v. Baskin and Sears*, 56 Md.App. 184, 467 A.2d 533 (1983); North Carolina, *See Hummer v. Pulley, Watson, King and Lischer*, 140 N.C.App. 270, 536 S.E.2d 349 (2000); North Dakota, *Feil v.*

*Wishek*, 193 N.W.2d 218, 225–226 (N.D. 1971); Virginia, *See Lyle, Siegel, Croshaw & Beale, P.C. v. Tidewater Capital Corp.*, 249 Va. 426, 457 S.E.2d 28 (1995). Wisconsin, *See, Gustavson v. O'Brien*, 87 Wis.2d 193, 274 N.W.2d 627 (1979), and Washington, *See Hansen v. Wightman*, 14 Wash.App. 78, 538 P.2d 1238, 1245 (1975).

6. The eight (8) are Arizona, *See Standard Chtd. PLC v. Price Waterhouse*, 190 Ariz. 6, 945 P.2d 317, 352 (App.1996) (contributory negligence not a complete defense to action for professional malpractice since Arizona is now a state which recognizes comparative fault); California, *See Li v. Yellow Cab*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975) (judicially rejecting doctrine of contributory negligence of plaintiff as a complete bar to recovery and adopting comparative negligence standard) and *Holland v. Thacher*, 199 Cal.App.3d 924, 929, 245 Cal.Rptr. 247 (Cal.App.1988) (recognizing that negligence imputed to client could reduce client's recovery in legal malpractice case); Illinois, *See Nika v. Danz, supra*, (while court recognized that contributory negligence was an affirmative defense in a legal malpractice action and that contributory negligence was formerly a complete bar to recovery; the court also noted that comparative negligence rules apply, in Illinois, to all negligence cases commenced after June 8, 1981), Indiana, *See Hopper v. Carey*, 716 N.E.2d 566, 575 (Ind.App.1999) (adoption of Indiana comparative negligence act eliminated contributory negligence of plaintiff as a complete defense in negligence actions), Louisiana, *See Murray v. Ramada Inns*, 521 So.2d 1123, 1132 (La.1988) (enactment of Louisiana comparative negligence statute eliminated rule that contributory negligence was a complete bar to recovery); North Dakota, *Fetch v. Quam*, 530 N.W.2d 337, 339 (N.D.1995) (contributory negligence of plaintiff no longer a complete bar to recovery in North Dakota in negligence actions), Wisconsin, *See Helmbrecht v. St.Paul*, 122 Wis.2d 94, 362 N.W.2d 118 (1985); *Schleus-*

¶ 39 Consequently, at this time, only four (4) states, Alabama, Maryland, North Carolina and Virginia, still cling to the largely repudiated notion that the contributory negligence of a plaintiff, no matter how infinitesimally slender, is a complete bar to monetary recovery for loss in a negligence action. *See* 57A Am.Jur 2d § 856, n. 62. Hence, in those four (4) states it would appear that a plaintiff in a legal malpractice action based on negligence, who was determined by a jury to have even been the slightest bit negligent, would be barred from recovery.

¶ 40 Anomalously, in the state of Wyoming, even though the doctrine of contributory negligence has been modified with the enactment of Wyoming's comparative negligence statute, that state's highest court explicitly refused to apply that statute to cases involving legal malpractice. In *Jackson State Bank v. King,* 844 P.2d 1093 (Wyo.1993) the Wyoming Supreme Court ruled that the relationship of an attorney and client is contractual in nature. Thus, the Court reasoned that:

> Even though legal malpractice may be attributable to negligence on the part of the attorney, still the right to recompense is based upon the breach of the contract with the client. It follows that, because this relationship is contractual in nature and is to be treated according to the law of contracts, there is no justification to invoke the comparative negligence statute.

*Id.* at 1096.

¶ 41 However, the continuing validity of this viewpoint is in serious doubt as the Wyoming Supreme Court has very recently suggested that its prior ruling in *Jack-son v. King* was inconsistent with other Wyoming precedent which recognized that a legal malpractice action could be based on principles of negligence as well as breach of contract. *See Long-Russell v. Hampe,* 39 P.3d 1015, 1016 (Wyo.2002). In any event, to the extent that the view espoused in *Jackson v. King* still survives, it has questionable value as guiding precedent since it has not been subsequently adopted or followed by any other state.

¶ 42 After considering the above-referenced great weight of authority on this subject, we agree with the rationale of the many states which have recognized that the negligence of a client may be raised as an affirmative defense by an attorney in a legal malpractice action that is based on a theory of negligence. As the California Court of Appeals has so cogently recognized many years ago:

> The rule is well established that an attorney is liable to his client for negligence in rendering professional services. The courts have consistently held that liability will be imposed for want of such skill, prudence and diligence as lawyers of ordinary skill and capacity commonly possess and exercise. The lawyer can thus properly be classified with members of various other professions who are considered to possess knowledge, skill or even intelligence superior to that of an ordinary man and are, as a consequence, held to a higher minimum standard of conduct. Doctors and dentists are held to this higher standard of care and their services [,like those of lawyers,] can also be said to be of a fiduciary and confidential nature. Hence it would seem clear that similar rules of

*ner v. Lamb,* 630 N.W.2d 275 (Wis.App.2001) (Wisconsin comparative negligence statute applied to apportion damages in legal malpractice action), and Washington, *See ESCA Corp. v. KPMG Peat Marwick,* 135 Wash.2d 820, 959 P.2d 651, 655–656 (1998) (under Washington comparative negligence statute, contributory negligence no longer absolute bar to recovery even when damages sought are for purely economic injury).

law would be applicable to all three professions. In actions against doctors and dentists for medical malpractice, courts have held the doctrine of contributory negligence to be a proper defense. A patient will thus be barred from recovery for medical malpractice where the patient has disobeyed medial instructions given by a doctor or dentist or has administered home remedies to an injury without the aid of medical advice. There would seem to be no reason whatever why the same rule should not be applicable in a medical malpractice action where there is evidence that a client chose to disregard the legal advice of his attorney.

*Theobald v. Byers, supra,* 193 Cal.App.2d at 150, 13 Cal.Rptr. 864 (citations omitted). *See also Nika v. Danz,* 145 Ill.Dec. 255, 556 N.E.2d at 884 ("[L]egal malpractice cases are no different from an ordinary negligence case where contributory negligence is an affirmative defense."); *Somma v. Gracey, supra,* 544 A.2d at 672 ("We see no basis for distinguishing between actions for legal malpractice and other claims sounding in negligence."); *Clark v. Rowe, supra,* 701 N.E.2d at 628 ("We recognize the doctrine of comparative negligence in medical malpractice actions, and there is no reason not to do so in legal malpractice actions."); *Becker v. Port Dock Four, supra,* 752 P.2d at 1239 ("Legal malpractice is a form of negligence. In other negligence contexts, finding of comparative fault can be based on the plaintiff's failure to take reasonable measures which might have prevented or reduced the injury caused by the defendant's negligence. We discern no convincing reason why that should not be true in this context."), *Accord Pizel v. Zuspann,* 247 Kan. 54, 795 P.2d 42, 52 (1990) and *Pontiac School District v. Miller, Canfield, Paddock, and Stone,* 221 Mich.App. 602, 563 N.W.2d 693, 704 (1997) (following rationale of *Becker*).

¶ 43 Since we find ourselves in agreement with our sister jurisdictions that in a legal malpractice action based on negligence, the negligence of a client, if proven at trial, may be considered by a jury in awarding damages, we must consider what effect a jury's finding of a client's negligence would have on the client's ultimate recovery. In Pennsylvania, the now outmoded, and widely criticized,[7] legal doctrine that contributory negligence functions as a complete bar to a plaintiff's recovery in a negligence action was modified with the legislature's enactment of 42 Pa.C.S.A. § 7102, which provides, in relevant part:

(a) General rule.—In all actions brought to recover damages for ***negligence resulting in death or injury to person or property***, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the causal negligence of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.

42 Pa.C.S.A. § 7102 (emphasis supplied). However, our Court has construed the above-highlighted language of the statute very narrowly. In *Wescoat v. Northwest Savings Association,* 378 Pa.Super. 295, 548 A.2d 619, 621 (1988) our Court held: "The [Pennsylvania Comparative Negligence Act] does not apply to all actions for negligence but only to those resulting in death or injury to person or property." Our Court interpreted the legislature's use

---

7. *See* Modern Development of Comparative Negligence Doctrine Having Applicability to Negligence Actions Generally, 78 A.L.R.3d 339 (1977).

of the term property in the act to mean "tangible property." Our Court thus reasoned that the purely monetary loss, which the appellant in the case had sustained, did not constitute damage to tangible property and, as a result, the statute did not apply. Since the comparative negligence. statute was held to not apply, our Court ruled that it was necessary to revert to the doctrine of contributory negligence. Our Court concluded: "Where the Comparative Negligence Act does not apply because there was no destruction or damage to property, then the doctrine of contributory negligence bars recovery if the plaintiff's negligence has contributed to his loss." *Id.*, at 623.

¶ 44 Subsequently, in *Rizzo v. Michener*, 401 Pa.Super. 47, 584 A.2d 973 (1990), *appeal denied*, 528 Pa. 613, 596 A.2d 159 (1991) a case involving the alleged negligence of a termite inspection company for failing to discover termite damage, our Court, relying on *Wescoat*, held that the jury, at trial, should have been charged on the issue of the homeowner's contributory negligence in failing to inspect the house. Additionally, in *Keller v. Re/Max Realty*, 719 A.2d 369 (Pa.Super.1998), a case based on the fraud and deceit of the prior owners

of a home and their realtor for failing to disclose the existence of a seriously malfunctioning septic system in the house they were selling, our Court looked to *Wescoat* and *Rizzo* to support its conclusion that the comparative negligence statute did not apply to a case of that type.

¶ 45 Appellants argue that since legal malpractice cases do not involve bodily injury or damage to property, *See Wagner v. Orie & Zivic*, 431 Pa.Super. 337, 636 A.2d 679 (1994) (delay damages not available in legal malpractice case since delay damages are available only in actions for "bodily injury, death or property damage"), legal malpractice actions are outside the scope of the comparative negligence act, and hence the doctrine of contributory negligence should apply. Based on our review of *Wagner* and the holdings of *Wescoat*, *Rizzo* and *Re/Max*, *supra* above, we are constrained to agree.[8] *See also Jewelcor v. Corr*, 373 Pa.Super. 536, 542 A.2d 72 (1988), *appeal denied*, 524 Pa. 608, 569 A.2d 1367 (1989) (where evidence existed showing that client may have provided erroneous inventory information to accountant, the issue of client's contributory negligence in an accounting malpractice action was properly submitted to the jury).

8. The Massachusetts Supreme Court also recognized that its state's comparative negligence statute, which, like ours, applies only to actions seeking damages for negligence "resulting in death or in injury to person or property," did not, by its terms, apply to an action to recover financial losses sustained as the result of legal malpractice. *Clark v. Rowe*, *supra*, 701 N.E.2d at 627. The Court's interpretation was compelled by prior Massachusetts' caselaw, which had held that pecuniary loss alone was not covered by the statute. Nevertheless, after considering the great weight of authority from other states, the Court adopted as a common law rule the doctrine of comparative negligence in legal malpractice actions. The Court reasoned that such a rule better served and furthered the public policy considerations which had led to

the original enactment of the comparative negligence statute. *Id.*

It may be that in the future, our Supreme Court, as the policy making court of our Commonwealth, may choose, as the Massachusetts Supreme Court did, to adopt the doctrine of comparative negligence in legal malpractice cases as a matter of sound public policy; however, for the present, as a panel of the Superior Court, we are bound by our Court's prior precedent which holds that Pennsylvania's comparative negligence statute is not applicable to actions brought solely to recover pecuniary loss. *See generally Aivazoglou v. Drever Furnaces*, 418 Pa.Super. 111, 613 A.2d 595 (1992) (until Supreme Court acts our Court will follow principles of law set down by prior appellate court decisions).

¶ 46 "Contributory negligence is conduct on the part of a plaintiff which falls below the standard [of care] to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm. Contributory fault may stem either from a plaintiff's careless exposure of himself to danger or from his failure to exercise reasonable diligence for his own protection." *Thompson v. Goldman*, 382 Pa. 277, 114 A.2d 160, 162 (1955) (internal citations omitted). However, our Supreme Court has also clearly recognized that "one is not bound to anticipate the negligence of another." *Bortz v. Henne*, 415 Pa. 150, 204 A.2d 52 (1964). Thus, "[i]t is not contributory negligence to fail to guard against the lack of ordinary care by another." *Sullivan v. Wolson*, 262 Pa.Super. 397, 396 A.2d 1230, 1234 (1978).

¶ 47 A client who retains an attorney to perform legal services has a justifiable expectation that the attorney will exhibit reasonable care in the performance of those services, since that is the attorney's sacred obligation to the client. The client is, therefore, under no duty to guard against the failure of the attorney to exercise the required standard of professional care in the performance of the legal services for which the attorney was retained. Imposing such a duty on the client would clearly defeat the client's purpose for having retained the attorney in the first place. Consequently, as a matter of law, a client cannot be deemed contributorily negligent for failing to anticipate or guard against his or her attorney's negligence in the performance of legal services within the scope of the attorney's representation of the client.

¶ 48 Courts of other jurisdictions have also recognized that a client cannot be contributorily negligent as a matter of law

for "relying on a lawyer's erroneous legal advice or for failing to correct errors of the lawyer which involve professional expertise." *Becker v. Port Dock Four, supra*, 752 P.2d at 1239; *Tarleton v. Arnstein & Lehr*, 719 So.2d 325, 331 (Fla.App.1998). *See also Pizel v. Zuspann, supra*, 795 P.2d. at 52 ("comparative law principles apply to a legal malpractice action unless as a matter of law the client had no obligation to act on the client's own behalf"); *Pontiac School District v. Miller, supra*, 563 N.W.2d at 703 (same). Such recognized limitations on the permissible scope of a client's contributory negligence are consistent with the above-cited principles of Pennsylvania law.

¶ 49 On the other hand, the contributory negligence of a client in a legal malpractice action has been recognized as a proper defense in those instances where the client has withheld or misrepresented information that is essential to the attorney's representation of the client. *See Hansen v. Wightman, supra*, 538 P.2d. at 1246; *Parksville Mobile Modular Inc. v. Fabricant*, 73 A.D.2d 595, 422 N.Y.S.2d 710, 715 (1979); *Martinson Brothers v. Hjellum*, 359 N.W.2d 865 (N.D.1985). Courts have also recognized the applicability of the defense in instances where the client has chosen to disregard the legal advice which the attorney provided to the client or has violated the instructions of the attorney. *See Theobald, supra*, 193 Cal.App.2d at 150, 13 Cal.Rptr. 864; *Conklin v. Hannoch Weisman, supra* 678 A.2d at 1068. This is also consistent with Pennsylvania law, since a client who withholds information from his attorney, misrepresents to the attorney crucial facts regarding circumstances integral to the representation, or fails to follow the specific instructions of the attorney has failed to exercise the reasonable care necessary for his or her own protection. Such ac-

tions by the client are a clear hindrance to the attorney's ability to adequately protect or advance the client's interests during the course of the attorney's representation.

¶ 50 Applying these standards to the case at bar, the Trial Judge was correct to enter judgment notwithstanding the verdict for the Gorskis on the count of negligent delivery of legal services with respect to the formation of the land sales agreement with Iacobucci, since, even considering the evidence of the case in the light most favorable to Appellants as verdict winner on this issue, the Gorskis were entitled to judgment as a matter of law. The Gorskis' actions under the circumstances of the case did not amount to contributory negligence. With respect to the negotiation of the land sale contract with Iacobucci, Mr. Gorski specifically relied on Attorney Jenkins to review the contract which was prepared by Iacobucci's representatives and to ensure that the contract legally accomplished what Mr. Gorski sought, namely to enable him to walk away if the requisite sewer approvals were not granted by the government authorities. Attorney Jenkins assured Mr. Gorski that the due diligence clause enabled the Gorskis to walk away from the agreement if the sewer approvals were not forthcoming. By so doing, Attorney Jenkins was giving legal advice to Gorski regarding the legal meaning and operation of contractual language. This advice, unfortunately for the expectation of the Gorskis, turned out to be erroneous. As a matter of law, then, the Gorskis could not have been contributorily negligent for relying on Attorney Jenkins' erroneous legal advice.

¶ 51 Appellants maintain that the Gorskis were negligent because they failed to exercise reasonable care since they entered into the agreement knowing that they could face potential liability if they could not obtain the requisite sewer approvals. However the evidence of record showed that it was the Gorskis' intention to avoid such liability by ensuring that they could terminate the agreement if those approvals were not forthcoming. In seeking Attorney Jenkins legal advice on this matter, the Gorskis could not be liable for failing to anticipate that Attorney Jenkins would incorrectly advise them as to their duties under the contract to perform and their right to terminate the contract.

¶ 52 Appellants also argue that the Gorskis were contributorily negligent for assuming that there would not be an issue regarding connection of the property to the sewer system. Appellants maintain the Gorskis failed to exercise reasonable care in "the manner in which they determined that there would not be an issue with the sewer." Appellant's Brief at 38. The record belies this assertion. The record shows that the Gorskis retained Jenkins for the express purpose of "mak[ing] all the arrangements so that everything was in order" for the sale of the property. N.T. Trial, 10/17/2000, at 118. Gorski testified that he had depended on Jenkins to make decisions regarding "legal issues." *Id.,* at 122. Attorney Jenkins scope of legal representation was not limited in any way. N.T., 10/18/2000, at 88. The scope of Attorney Jenkins' duties attendant to his representation specifically encompassed obtaining confirmations and conducting the negotiations with the various government agencies so that Gorski was not personally involved. N.T. Trial, 10/17/2000, at 126–127.

¶ 53 Attorney Jenkins admitted in his deposition, which was read into evidence at trial, that he understood that the Skippack Township Solicitor, in his letter of July 2, 1993, that was incorporated into the contract, had specifically requested that Jenkins furnish to him a letter from the sewer

authority that they would be servicing the proposed subdivision of the property. N.T., 10/18/2000, at 90–92. Attorney Jenkins acknowledged that he and Mr. Gorski discussed the engineer's request, but that Attorney Jenkins did not obtain that letter prior to the contract being signed. Attorney Jenkins testified that he relied on Mr. Gorski's oral assertion to him that Gorski had all the necessary "permits" for the property. *Id.* at 95–96. Mr. Gorski apparently labored under the mistaken belief that he had the requisite approvals due to the fact that he had old sewer permits, known as Equivalent Dwelling Units (EDU's) which he had purchased in the late seventies. N.T. Trial, 10/17/2000, at 113–115; 10/19/2000, at 105–106. Although the requirement for a letter from the sewer authority was specifically incorporated in the contract, Attorney Jenkins did not make any effort to contact the sewer authority and obtain a letter from them, or have them or the township solicitor confirm that Mr. Gorski's EDU's would be a legally valid substitute for the letter. N.T., 10/18/2000, at 125–128.

¶ 54 Attorney Jenkins failure to obtain the required letter, or to further investigate to determine if Mr. Gorski's possession of the EDU's was enough to satisfy the contractual requirement of a written commitment from the sewer authority to provide service to the property was clearly not reasonable under the circumstances. The contract, which specifically incorporated the communication from the township engineer to Attorney Jenkins, required that a current *letter* from the sewer authority be obtained indicating its present intention to provide service to the property. A written letter agreeing to currently provide service was a document considerably different in nature and legal construct than the very old EDU's that Gorski pos-

sessed. Indeed, as the Gorskis point out, Jenkins should have known, from his prior representation of the Gorskis, that those EDU's did not legally bind or commit the sewer authority to provide service to the property, since the authority had previously imposed a moratorium on construction which superseded those permits and rendered them inoperable. *Id.* at 128. Thus, it was not reasonable for Attorney Jenkins to assume that the permits which Gorski possessed constituted a binding promise by the sewer authority to currently agree to service the property. Since the scope of Attorney Jenkins' representation of Gorski specifically involved the obtaining necessary legal approvals from the relevant government agencies, Jenkins had the sole duty to obtain and provide the letter, as requested by the solicitor, indicating the sewer authority's current specific agreement to service the property. Alternatively, Attorney Jenkins, as Mr. Gorski's counsel who was charged with the duty of obtaining all necessary legal approvals, should have at least inquired of the sewer authority whether Mr. Gorski's old permits would be honored in lieu of the letter, or at least have warned Gorski that the EDU's would not meet the contractual requirements. As Attorney Jenkins conceded, he undertook no such investigation, nor did he advise Mr. Gorski, prior to entering the contract, that the contract specifically required a letter from the sewer authority and that the old EDU's would not suffice. As Attorney Jenkins breached a duty that was attendant to his specified scope of legal representation, the Gorskis were therefore not negligent, as a matter of law, for failing to anticipate or guard against Attorney Jenkins negligence. Thus, we affirm the entry of judgment notwithstanding the verdict in favor of Appellants on Count I of their complaint.[9]

9. In this unique set of circumstances, we need not remand for a new trial on the issue of

¶ 55 Appellants' next argument concerns the Trial Court's award of damages with respect to Count III of the Gorskis' amended complaint, which was based on Attorney Jenkins' representation of Mr. Gorski at the trial involving Iacobucci. Appellants were found wholly negligent on this count by the jury; however, the jury did not award damages to the Gorskis on this count. Appellants maintain that the Trial Court acted improperly by subsequently granting the Gorskis' motion for judgment notwithstanding the verdict and assessing damages against them on this count.

¶ 56 Appellants, relying on our Court's holding in *Picca v. Kriner*, 435 Pa.Super. 297, 645 A.2d 868, 871 (1994), *appeal denied*, 539 Pa. 653, 651 A.2d 540 (1994), first contend that the Gorskis waived the issue of the jury's failure to award damages by failing to raise an objection before the jury panel was dismissed. *Picca* was a jury trial in which the appellee, Kriner, conceded his negligence in the causing of an automobile accident. The jury was instructed that they were to find the appellee negligent, which they did; however, the jury then found that the appellee's negligence was not a substantial factor in causing appellant's injuries. This was not a reasonable finding since appellee's expert had conceded that the accident had caused some injury to appellant, although appellee maintained that any injury was minor and appellant's pain was the result of her preexisting medical conditions. When the jury returned its verdict in the case, counsel for appellant did not object to the jury's verdict, which would have allowed the trial court to ask the jury to clarify its verdict. Trial counsel instead polled the jury, and the jury was dismissed. Trial counsel then challenged the jury verdict via a motion for a new trial, which the trial court granted.

¶ 57 On appeal, our Court reversed and held that appellant had waived the issue regarding the adequacy of the jury's verdict since her counsel failed to render a timely objection to the verdict at the time of trial while the jury was empanelled. Our Court observed that the jury verdict was ambiguous and may have been the result of the manner in which an interrogatory to the jury was drafted. The jury had been asked in that interrogatory

---

damages with respect to Count I since the Gorskis do not challenge the Trial Court's structure of the final judgment which it entered on the jury's verdict. Although the Trial Court awarded damages on Count I of the complaint in the amount of $435,000 the Court did not add those damages to the total award of the jury. As the Gorskis point out, Count I of the complaint was based on the identical events and transactions which comprised Count II of the complaint, the breach of contract claim, for which the jury awarded $435,000. Thus, although proceeding on two separate legal theories of recovery with respect to Attorney Jenkins' handling of the negotiations regarding the land sales agreement, the Gorskis sustained only one compensable financial harm as a result of his handling of those negotiations. Consequently, when the Trial Judge awarded $435,000 on Count I of the complaint, he obviously viewed this award as merely coextensive with the amount of damages already fixed by the jury on Count II of the amended complaint. The Gorskis did not, in their post-trial motions, request a new trial on the issue of damages with respect to Count I, and do not now challenge the manner in which the Trial Court assessed total damages. Thus, since the award by the Trial Court on Count I of the amended complaint did not increase Appellants' total financial liability beyond that which the jury had intended, a remand for a new trial on the issue of damages with respect to Count I of the complaint is unnecessary. We will therefore affirm this portion of the Trial Court's entry of judgment on the jury verdict, as it is currently structured, awarding total damages on both Count I and Count II of the amended complaint in the amount of $435,000.

whether the defendant's negligence was a substantial factor in bringing about the plaintiff's harm. Our Court noted that this broad ambiguous phrasing of the interrogatory yielded one of two possible interpretations of the jury verdict. One interpretation was the incredible conclusion that the appellant suffered no injury as the result of appellee's actions. The second interpretation of the jury's findings was that the appellee did cause injury to appellant but that the negligence did not cause enough of appellant's injury to be considered a "substantial factor" in causing her harm. Our Court reasoned that waiver was appropriate for counsel's failure to object in such instances, since the judge could have, in accordance with counsel's specific objections, explained to the jury why the verdict made no logical sense, and then asked them to reconsider. *Id.*, at 871.

¶ 58 Subsequent to *Picca*, however, our Court has strictly limited the application of its holding and restricted its application to situations where juries have returned "verdicts of obvious inconsistency and clear, certain irrationality." *Henery v. Shadle*, 443 Pa.Super. 331, 661 A.2d 439, 442 (1995), *appeal denied*, 542 Pa. 670, 668 A.2d 1133 (1995); *Accord Fillmore v. Hill*, 445 Pa.Super. 324, 665 A.2d 514, 519 (1995), *Lewis v. Evans*, 456 Pa.Super. 285, 690 A.2d 291, 292 (1997). Thus:

> the *Picca* waiver rule is only applicable to cases in which a litigant's failure to object to improper or ambiguous jury instructions or interrogatories causes an inconsistent verdict. The waiver rule should not be applied to cases in which the verdict is clear and unambiguous, albeit problematic, troublesome or disappointing.

*King v. Pulaski*, 710 A.2d 1200, 1204 (Pa.Super.1998).

¶ 59 In the case at bar the jury's award of zero (0) damages with respect to Count III of the amended complaint, while undoubtedly disappointing to the Gorskis, was not ambiguous or inconsistent. Here, unlike in *Picca, supra*, there was no ambiguous jury instruction or interrogatory that, on its face, appeared to be the cause of the jury's verdict. The jurors were instructed that if they found that Appellants had been negligent and the Gorskis had not been contributorily negligent, with respect to either Counts I or III of the amended complaint, then they were to indicate what damages **"if any"** had been sustained by the Gorskis. *See* Verdict Slip, Question 8. The jurors were all polled by the Trial Court as to their verdict and award of damages and indicated their unanimity; thus, the Gorskis had no basis on which to object and ask the jurors to re-deliberate on the issue of damages. Had the Trial Court ordered a re-deliberation on the issue of damages under these circumstances, it would have been an invasion by the Trial Court of the jury's fact-finding function, and it would have been improper. "A trial judge is not at liberty to suggest to the jury that the weight of the evidence did not support its damage award." *Hobbs v. Ryce*, 769 A.2d 469, 472, n. 3 (Pa.Super.2001) (quoting *Burnhauser v. Bumberger*, 745 A.2d 1256, 1260 (Pa.Super.2000)). The Gorskis properly raised their objection to the sufficiency of the jury's verdict via post-trial motions, and the allegation of error is not waived. *Id.*

¶ 60 Nevertheless, the Gorskis in their post-trial motions did not request a new trial on this count of the complaint on the basis of insufficiency of the damages, but rather requested only that the Trial Court mold the verdict on this count to include an award for damages. Our Court has recognized the inherent power of a Trial Court to mold a jury verdict to

conform to the clear intent of the jury. *Mendralla v. Weaver*, 703 A.2d 480, 485 (Pa.Super.1997). However,

> [w]hile a trial court has discretion in deciding whether to mold a verdict, it must nonetheless adhere to the principle that *a verdict may only be molded where the intention of the jury is clear* .... [W]here the intention of the jury is far from obvious the verdict should be returned to the jury for further deliberations or a new trial should be granted.

*Id.* at 486 (emphasis supplied). In the case *sub judice*, the Trial Court molded the verdict to include an award of $435,000 as compensation for the jury's finding that Attorney Jenkins was negligent in handling the litigation involving Iacobucci. We discern no clear intent on the part of the jury to award this amount of damages. Appellants point out the jury may have deliberately elected to award zero (0) damages on this count since the jury may have viewed the $435,000 which they awarded on the breach of contract claim to have been sufficient compensation for the total financial losses that the Gorskis had suffered. That $435,000 figure apparently reflected the amount which the Gorski's paid to settle Iacobucci's claim in the bankruptcy proceeding, $425,000, as well as an additional $10,000 which the Gorskis had paid in closing costs fees to cover a mortgage that they had to take in order to cover what they paid to settle Iacobucci's claim.

*See* N.T., 10/17/2000, at 216. Thus, the jury's award of zero (0) damages on Count III of the complaint, in light of the amount of its award of damages on the breach of contract claim, reasonably appears to be reflective of its true intent. It was therefore improper for the Trial Court to mold the verdict and award a specific damage amount.[10] The Trial Court's entry of judgment against the Appellants for $435,000 on Count III of the amended complaint is consequently vacated, and the jury's original verdict of zero (0) damages on this count is reinstated.[11]

¶ 61 In Appellants' next issue they contend that the Gorskis did not suffer actual damages as a result of their breach of contract and negligence. Appellants posit that not only did the Gorskis not suffer damages but Appellants maintain that, in fact, the reverse occurred and that the Gorskis actually profited by the malpractice. Appellants calculate that the Gorskis ultimately received approximately $260,000 more than they would have originally as the result of the malpractice. Appellants theory is apparently based on the fact that the Gorskis eventually sold the subject property for 1.4 million dollars and paid Iacobucci $425,000. Thus, by Appellants view, the Gorskis netted $975,000. Had the Gorskis sold the property to Iacobucci to begin with, Appellants reason, the Gorskis would have received a mere $710,000, what the contract price called

---

**10.** The issue of whether a new trial was warranted for the jury's failure to award adequate damages is not before us since the Gorskis did not request a new trial on the issue of damages in their post trial motions, but rather merely requested molding of the verdict. *See e.g. Dougherty v. McLaughlin*, 432 Pa.Super. 129, 637 A.2d 1017 (1994) (where jury renders an inadequate verdict, and damages are disputed, the proper remedy is not the trial court's grant of additur but the grant of a new trial); *Kelly v. St. Mary Hospital*, 778 A.2d 1224, 1227, n. 2. (Pa.Super.2001)(failure to

raise an issue in post-trial motions results in waiver of the issue).

**11.** The vacation of this judgment does not alter the total amount of the final judgment entered against Appellants since the Trial Court did not add the damages it awarded on this count to the amount which the jury had already awarded on the breach of contract claim set forth in Count II of the amended complaint.

for. Hence, because of this apparent "windfall," Appellants maintain that the Gorskis are not entitled to recovery since they cannot show actual damages.

¶ 62 The Gorskis respond by reminding that had Appellants not allowed them to enter into the agreement as it had been structured, they would not have done so and would not then have later incurred liability to Iacobucci, nor would they have pursued the litigation against Iacobucci had they been properly advised as to the correct interpretation of the agreement's terms. As a result of the decision to enter the agreement and to pursue the litigation, the Gorskis claim to have incurred significant expenses. Had the original agreement not been entered into, the Gorskis point out that they would have been free to walk away from the original transaction with Iacobucci when the problems with the sewer authority developed. When the sewer authority later made improvements which allowed the property to be serviced, the Gorskis would then have been free to sell the property and realize the entire proceeds of the 1.4 million dollar selling price, rather than the lesser amount which they netted after paying off the mortgage which they took to pay Iacobucci and their other litigation expenses.

¶ 63 As the Gorskis point out in their brief, Appellants' claim that their tortious conduct conferred a benefit upon the Gorskis which should diminish the amount of their recovery is, in essence, an invocation of the "benefit rule" of tort law, which has been articulated in the Restatement of Torts Second in the following fashion:

> Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in

mitigation of damages, to the extent that this is equitable.

Restatement 2d of Torts, § 920 (1979). This specific section has been previously recognized as applicable in Pennsylvania tort actions. *See Ellis v. Sherman,* 512 Pa. 14, 515 A.2d 1327, 1329 (1986).

■■ ¶ 64 We agree with the Gorskis' argument that this section does not apply when the tortious conduct of the defendant did not directly confer on the plaintiff a "special benefit." Appellees Brief at 40. *See* Restatement, *supra,* § 920(d), (emphasis supplied) ("Causation. Under the rule stated in this Section to justify a diminution of **damages the benefit must result from the tortious conduct.**)" The Restatement provides the following illustration of this principle:

> 9. A fraudulently persuades B to purchase Blackacre for $3,000, although, its value at that time is $2,000. Had Blackacre been as represented, the value of would have been $3,500. The following week changes in the neighborhood cause Blackacre to appreciate in value to $5,000. B's measure of recovery is not diminished by the subsequent rise in market value.

Restatement of Torts Second, § 920, Illustration 9.

¶ 65 In the case at bar, the actions which the jury found constituted breach of contract and legal malpractice did not directly confer any benefit on the property held by the Gorskis, nor did those actions directly result in any increase in the value of the Gorskis property. Any increase in the selling price of the property was the result of the sewer authority's subsequent correction of the infiltration and capacity problem. That action, however, did not relieve the Gorskis of their liability to Iacobucci under the terms of the original land sales agreement. The amounts which the Gorskis were forced to pay Iacobucci were

direct financial losses sustained by them and those losses unquestionably diminished the net amount which they eventually realized from the subsequent sale of the property.

¶ 66 In Appellants' fifth issue they contend that the evidence did not support the entry of judgment against them on the Gorskis' claim for bad faith. Appellants point out that in Pennsylvania bad faith actions are usually brought by insureds against their insurance companies regarding the insurance companies' unreasonable failure to properly settle a claim under an insurance policy. Appellants are obviously not insurers of the Gorskis; consequently, they reason that because the cause of action for bad faith against them was premised solely on Appellants conduct in the bankruptcy proceeding, that conduct, in and of itself, did not provide a legally sufficient basis for a bad faith claim.

■■■■ ¶ 67 We begin by observing that in Pennsylvania there is no general common law cause of action in tort solely for "bad faith." *Waye v. First Citizen's Bank*, 846 F.Supp. 310, 315, (M.D.Pa. 1994); *City of Rome v. Glanton*, 958 F.Supp. 1026, 1038 (E.D.Pa.1997). "Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts." *Creeger Brick v. Mid–State Bank*, 385 Pa.Super. 30, 560 A.2d 151, 153 (1989) (quoting *AM/PM Franchise Association v. Atlantic Richfield Co.*, 373 Pa.Super. 572, 542 A.2d 90, 94 (1988)). "The duty of 'good faith' has been defined as '[h]onesty in fact in the conduct or transaction concerned.' " *Id.* (quoting 13 Pa.C.S. § 1201 and Restatement of Contracts § 705, Comment a.) Here the Gorskis did not plead or prove at trial any breach of a contractual duty of good faith by Appellants with respect to their actions in the bankruptcy proceeding. The Appellants representation of the

Gorskis had been terminated prior to the commencement of the bankruptcy proceedings, so no contract existed between them at that time. The Gorskis also did not assert, nor did they prove at trial, any breach of the duty of good faith, i.e. any dishonesty on the part of the Appellants, related to their performance under the prior agreement of representation.

■■■■ ¶ 68 We recognize, also, that the Supreme Court has defined the all-encompassing term bad faith to include activities which constitute "fraud, dishonesty, or corruption." *Frick v. McClelland*, 384 Pa. 597, 122 A.2d 43, 45 (1956) (quoting *McNair's Petition*, 324 Pa. 48, 187 A. 498 (1936)); *Accord In re Appeal of Affected & Aggrieved Residents from Adverse Action, etc.*, 325 Pa.Super. 8, 472 A.2d 619, 623 (1984). Fraud and deceit are actionable in tort. *See generally Wilson v. Donegal Mutual Insurance Company*, 410 Pa.Super. 31, 598 A.2d 1310 (1991) (setting forth elements of cause of action for fraud and deceit). Nevertheless, the Gorskis did not plead any instances of, or adduce at trial any evidence of, fraudulent, dishonest or deceitful actions by the Appellants in connection with the bankruptcy proceedings.

¶ 69 A careful reading of the Gorskis' amended complaint reveals that, though they titled Count V as a cause of action for bad faith, the specific allegations, as framed in the pleadings related to this count, indicate that, in reality, the Gorskis were attempting to assert a cause of action against the Appellants for breach of fiduciary duty. The Gorskis asserted in their amended complaint, in relevant part:

75. The Jenkins firm violated their duty to act in good faith and to avoid conflict of interest with the Gorskis as their former clients, and relied upon the confidential information which they obtained during the course of Gorskis' representation, by voting in favor of the

Iacobucci plan of reorganization and thereby impeding the Gorskis' ability to obtain approval of a plan of reorganization which would permit them to pursue their appeal of the Iacobucci judgment without losing their real estate holdings. Gorskis' Amended Complaint, filed 11/24/97, at ¶ 75.

¶ 70 A cause of action may be maintained against an attorney for breach of his or her fiduciary duty to a client. In *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277 (1992) our Supreme Court specifically recognized that an attorney owes a fiduciary duty to his or her client and is bound to execute that fiduciary duty properly. The Supreme Court held that part of the fiduciary duty which arises out of the attorney client relationship is that of undivided loyalty. This duty, the Court emphasized, prohibits an attorney from engaging in activity which constitutes a conflict of interest, and the Court held that a breach of that duty by the attorney is actionable. *Id.* at 1283.

¶ 71 In *Maritrans* the defendant law firm had represented its client, a shipping company, in labor negotiations with its work force. While still representing the client, the law firm had begun to secretly represent the client's shipping competitors in labor related matters. The client discovered them engaging in this practice, and the firm agreed to limit their representation. However the firm subsequently terminated its representation of the client and began to actively represent the client's competitors. The client sought injunctive relief, and subsequent evidentiary discovery indicated that because of its prior representation of the client, the firm had acquired confidential information from the client relating to its labor negotiation strategy that it did not wish to have its competitors possess. The trial court granted the injunction and the Supreme Court affirmed. The Court reasoned that "[t]here is a substantial relationship here between [the firm's] former representation of [the client] and their current representation of [the client's] competitors such that the injunctive relief granted here was justified ... As fiduciaries, [the firm] can be fully enjoined from representing [the client's] competitors as that would create too great a danger that [the client's] confidential relationship with [the firm] would be breached" *Id.* at 1287.

¶ 72 No such conflict of interest existed in the case at bar. At the time of the bankruptcy proceeding Appellants representation of the Gorskis had ceased. The Appellants did not undertake in any manner to represent Iacobucci in the bankruptcy proceedings, nor does the record reflect that they used confidential information which they had acquired from the course of their prior representation of the Gorskis to aid Iacobucci. The Gorskis various assets and liabilities were matters of public record by virtue of their filings with the Bankruptcy Court. Appellants merely filed a claim for legal services which they had previously rendered to the Gorskis, which, as a creditor of the Gorskis, they were permitted to do by the Bankruptcy Code. *See* 11 U.S.C. § 501(a).[12] The Gorskis' interests were not materially prejudiced solely by Appellants' pursuit of this claim, since the Bankruptcy Court was empowered to consider the reasonable value of the legal services, which Appellants rendered in light of the resultant judgment entered against the Gorskis. *See* 11

---

12. Section 501 of the Bankruptcy Code allows any creditor of the bankrupt debtor to file a proof of claim in a bankruptcy proceeding. The Appellants, by virtue of amounts they alleged were owed to them by the Gorskis for legal services rendered, had attained the status of a creditor of the Gorskis.

U.S.C. § 502(b)(4).[13] Indeed, as the Gorskis' own expert testified, the actions of Appellants in ultimately voting for the final Iacobucci plan of reorganization, over the Gorski plan, did not cause the Gorskis to suffer any financial harm. N.T. Trial, 10/18/2000, at 61.

¶ 73 Furthermore, the record does not support the Gorskis allegation that their appeal of the adverse judgment against them in the litigation against Iacobucci was inhibited by Appellants' actions. The record reveals that the Gorskis did not proceed with the appeal of the judgment prior to their entry into bankruptcy since they could not afford an appeal bond. N.T. Trial, 10/17/2000, 199–200, 203. After entry into bankruptcy, the bankruptcy court judge would only allow the appeal to proceed if the Gorskis agreed to allow the sheriff's sale of the subject property, sought by Iacobucci, to proceed. N.T. Trial, 10/20/2000 at 102–104. This was unacceptable to the Gorskis, and they elected not to proceed with the appeal as a result. The record reflects that it was solely Iacobucci who refused to allow the appeal to proceed unless he was permitted to sell the subject properties. Id. Appellants played no role in this portion of the bankruptcy proceeding whatsoever. Thus, the Gorskis did not produce sufficient evidence to prevail on their claim that Appellants breached a fiduciary duty owed to them. Consequently, the judgment entered on the jury's verdict on this claim must be vacated.

¶ 74 Lastly, Appellants argue that the Trial Court should have granted their motion for a mistrial, or in the alternative a *voir dire* of the jury panel, due to one juror's observation of the antics of one of the attorneys in Appellants law firm. Specifically, as the trial was going on and counsel for the Gorskis was questioning Mr. Gorski, one of the jurors saw one of the attorneys who was a regular employee of Appellants firm,[14] "rolling her eyes, squinching her face, and flailing her arms all over the place . . . and banging her head against her hand." N.T. 10/18/2000, at 2. The juror related that later when she was outside of the courthouse with two other jurors smoking a cigarette she observed the attorney talking on her cell phone and "cursing up a storm." Id. at 3. The juror who had observed this conduct was apparently so disturbed by it that she sought out the Trial Judge and related to him what she had seen. After conferring with the attorneys, the Trial Judge brought the juror back into the robing room and, in the presence of both attorneys questioned her about the incident. After considering her testimony, the Trial Judge, in an abundance of caution, dismissed her as a juror and replaced her with an alternate juror. The Court denied Appellants' motion for a mistrial and for further *voir dire* of the jury panel regarding the incident. The Court did not inform the jury panel of the reason for the juror's departure.

¶ 75 In reviewing a trial court's decision to deny a request by a party for a mistrial we will reverse only if the trial court committed an abuse of discretion or

---

**13.** Section 502(b)(4) of the Bankruptcy Code "refers to claims for services rendered prior to the [bankruptcy] petition and unpaid at the time of the filing of such petition with respect to services rendered by . . . an attorney to or for the debtor or the entity which subsequently becomes a debtor." 3 Collier on Bankruptcy, ¶ 502.02[5] (15th ed.1996). That section allows "the court to examine the claim of a debtor's attorney . . . independently of any other provision of the statute and to disallow it to the extent it exceeds the reasonable value of the services." Id.

**14.** This attorney was not representing Appellants at trial.

legal error in denying the request. *Gatto v. Kisloff,* 437 Pa.Super. 328, 649 A.2d 996, 997 (1994). Our review of the entirety of the circumstances surrounding Judge Smith's handling of this incident indicates no abuse of discretion or error of law on his part. Once the learned Trial Judge became aware of the juror's discomfort at what she perceived to be unprofessional conduct on the part of the attorney, he took swift action to forestall any potential prejudice to the jury which may have resulted from this juror's personal opinion. It is also quite clear from the following testimony of the dismissed juror that she was the only member of the panel who had been seriously disturbed by this behavior:

THE COURT: ... One of the things we did say is, we need 12 jurors to make a decision, and we have two extras in there, but there were other people that you think may have seen as much or more or heard as much?

JUROR NO. 8: I don't think they thought of it the same way I did.

THE COURT: You were the observant one and put this altogether.

JUROR NO. 8: Yeah. Because I had asked the woman who sat next to me, "Did you by chance see [the attorney,] like she was giving looks and everything?" She is like "I saw her for a second, that was it." I said, "Oh, okay." I didn't see—the other guy said he saw her rolling her eyes, he chuckled about it. He thought it was funny. Maybe its because I am younger, I am too critical. I don't know.

\*　　\*　　\*　　\*　　\*　　\*

[Appellant's counsel]: Did you have any discussions with anybody else that the Judge, [Gorski's counsel] and I might need to think about before we move forward?

JUROR NO. 8: No.

THE COURT: Just those two?

JUROR NO. 8: Just those two.

THE COURT: You reported in and you came back here, right?

JUROR NO. 8: Uh-huh.

N.T., 10/18/2000, at 22–23, 27.

¶ 76 Thus, in light of the fact that only one (1) juror had been affected by the behavior of the attorney, and the juror was dismissed before having any opportunity to affect the other jurors' consideration of the case, a mistrial was unwarranted. Moreover, the Trial Judge's choice to dismiss the juror without explanation, or further *voir dire,* was certainly reasonable in that he did not wish to place undue emphasis on this attorney's conduct to the rest of the jury panel who had been unaffected by the attorney's conduct. Additionally the Trial Judge in instructing the jury admonished them to consider only the evidence of the case and to keep their deliberations free from bias or prejudice of any kind towards the parties. N.T. Trial, 10/26/2000, at 42. Thus, under these circumstances, Appellants sustained no prejudice to their right to a fair trial. *See Brancato v. Kroger,* 312 Pa.Super. 448, 458 A.2d 1377, 1384 (1983) (where evidence of record indicates that jury as a whole was unaffected by one juror's brief contact with plaintiff in case, no prejudice occurred which would have caused the jury, in deciding the case, to disregard the trial court's instructions).

¶ 77 In sum, for all of the aforementioned reasons, we affirm the entry of judgment by the Trial Court on Counts I and II of the amended complaint, and we vacate the judgments entered by the Trial Court on counts III and V of the amended complaint.

¶ 78 Judgment affirmed in part and vacated in part. Jurisdiction is relinquished.